Clara Charbonnier, Administratrix of the Estate of Edward Reckels, Deceased, Appellee, v. Chicago National Life Insurance Company, Appellant.

Gen. No. 35,486.

Opinion filed May 17, 1932.

LEE D. MATHIAS, for appellant; CLYDE L. TODD, of counsel.

No appearance for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

In a first class action in assumpsit, based upon a policy of life insurance and tried without a jury in May, 1931, there was a finding and judgment in plaintiff's favor for $1,850, and defendant appealed. No appearance or brief has here been filed by plaintiff.

In plaintiff's statement of claim, filed March 2, 1931, she alleged that she is the administratrix "with will annexed" of the estate of Edward Reckels, deceased; that during his lifetime Reckels "was the holder" of a life insurance policy issued by defendant under date of December 31, 1928, for $1,000, "plus an emergency draft for $850," and payable to his "estate" (copies of policy and draft attached); that Reckels died on

March 18, 1930, at which time all premiums had been paid and the policy was in full force and effect; and that there is now due from defendant to plaintiff the sum of $1,850, etc.

In defendant's affidavit of merits it admitted that plaintiff is the administratrix of the estate and that Reckels died on March 18, 1930, but it denied that he ever was the "holder" of said policy No. 39154. And defendant alleged that "one Emil O. Kowalski, *who had no insurable interest in the life of the deceased,* in the month of December, 1928, signed the name of said Reckels to a non-medical application for insurance," a photostatic copy of which application was attached to and made a part of the policy; that the application was not signed by Reckels; that pursuant to it and believing that it was actually signed by him defendant mailed the policy to his given address, 50 West 44th street, Chicago; that thereafter Kowalski, knowing that he had no insurable interest in Reckels' life, procured him to execute an instrument purporting to be his last will, dated January 11, 1929, "in the handwriting of said Kowalski," whereby Reckels nominated Kowalski as the beneficiary of the proceeds of the policy; that the procuring by Kowalski of the execution of the will "was but a subterfuge to overcome the provisions of the law by virtue of which Kowalski had no insurable interest in the life of Reckels"; that Kowalski was not a relative of Reckels; that he paid all premiums on the policy and Reckels paid none; that at the times of the making of the application, the issuance of the policy and the execution of the will Reckels "was a drunkard and in a poor state of health," which facts were well-known to Kowalski; and that by reason of the foregoing the policy sued upon "is of no force and effect and is contrary to public policy and void."

A portion of the application is set out in the affidavit of merits, from which it appears that the "undersigned" applies for one of defendant's "special adver-

tised Annual Renewable and Convertible Term Policies," and represents and declares "that I am now in good health, and of sound mind to the best of my knowledge and belief; that I am temperate in my habits; that there is nothing about my habits or occupation, past or present, that might tend to shorten my life except as stated below; that I further agree and declare that all statements and answers to questions herein are and shall be treated as material to the risk and shall form part of the policy contract issued to me and the whole truth of such statements and answers is the basis of and part of the consideration for such insurance, . . . ''

Based upon the application, defendant, in its affidavit of merits, made the further defense of fraud and misrepresentation, alleging in substance that, when it received the application, it believed the representations therein to be true and relied upon them; that had it known them to be false it would not have issued the policy; that Reckels was not in fact in good health and was not temperate in his habits, as Kowalski then well knew; and that Reckels was an habitual drunkard, of which fact defendant was not informed and did not have knowledge until after his death. And defendant tendered the aggregate amount of all premiums which had been paid to it by Kowalski.

At the opening of the trial defendant kept the tender good and in open court offered to pay the amount of all premiums received by it, aggregating $34, together with $2.50 interest thereon (in all $36.50), but the offer was refused. Thereupon plaintiff introduced in evidence (a) the policy, with emergency draft and photostatic copy of the application attached; (b) certified copy of "Letters of Administration with Will Annexed," issued to plaintiff by the probate court of Cook county on August 14, 1930; and (c) formal proofs of the death of Reckels in Chicago on March 18, 1930.

The policy is dated December 31, 1928, is for $1,000, "plus such amount as may be payable under the terms of the draft attached hereto"; and is payable to the "Estate" of Reckels "immediately upon receipt of due proofs of the interest of the claimant" and of the death of Reckels. The premium is two ($2) dollars per month, first payment of $2 to be made at time of application, and $2 every month after date of policy. One of its provisions is that "This policy is free from restrictions as to occupation, residence or travel and shall be *incontestable after it shall have been in force,* during the lifetime of the insured, *for one year* from date of issue, except for non-payment of premium," etc. The amount of the draft to be paid varied as to the age of the insured at death. At the age of 47 the amount to be paid in addition to the face of the policy was $850, and it was stipulated that he was 47 years old when he died. It was provided that the draft on defendant could be drawn in advance of the receipt of proofs of death "and accepted without admission by the company of further liability under the policy." In the "affidavit" of Kowalski, sworn to March 29, 1930, and which accompanied the draft "for the purpose of obtaining immediate payment," he stated that he "is the sole beneficiary under policy No. 39154"; that Reckels died on March 18, 1930; and that "his death was caused by *exposure and starvation,* bronchial pneumonia, and was not the result of the insured's own hand or act." In the proofs of death forwarded by Kowalski and stamped as received by defendant on April 11, 1930, is his affidavit sworn to March 28, 1930, as a "claimant under will," stating that he "is the holder and owner of policy No. 39154"; that he "has a good and valid interest in the policy to the amount of $1,000"; and that he is legally entitled to receive the amount "as the beneficiary of the deceased." Attached to the proofs of death, introduced by plaintiff,

is a further affidavit of plaintiff (sister of deceased), sworn to October 15, 1930, headed "Proof from Claimant" and stamped as received by defendant on that date. In this affidavit she states that *she*, as administratrix, etc., "is the holder and owner of policy No. 39154"; that she "has a good and valid interest in the policy to the amount of $1,000 and draft $850"; and that she is legally entitled to receive said amounts "as the administratrix of the estate of the deceased."

On the trial defendant introduced in evidence certain writings, among them the original application (filled out in pencil handwriting on a printed form) and a photostatic copy of Reckels' will, marked as having been filed on May 29, 1930, and admitted to probate in the probate court of Cook county on August 14, 1930. On defendant's behalf eight witnesses testified, among them Robert Peters (the agent who took the application); Emil O. Kowalski (the named beneficiary in the will); Henry Charbonnier (brother-in-law of Reckels); and James Manfredini (an employee of defendant). No testimony in rebuttal was introduced by plaintiff.

The application is headed "Non-Medical Application" and contains in printed type the representations as stated in defendant's affidavit of merits; then follow 24 questions, usual in such applications, to be answered by the applicant, and answers to some of them; and then follow the date "Dec. 13, 1928" (in pencil) and the signature (in pencil) "Edward Reckels," which is witnessed by "R. E. Peters." The answer to question No. 23, viz., "Name of proposed beneficiary, with right of revocation reserved," and "Relationship," is the word "Estate" (in pencil). The application on its face shows that the answers to question No. 23, as originally written, were partially erased and the word "Estate" written over them. The will is on one sheet of paper and bears the signature of the testator "Edward Reckels," with address at "50 W.

44th st.''; then follow on the same sheet the signatures of three witnesses, including that of *"Emil O. Kowalski,"* with address at ''50 W. 44th st.'' The will is as follows:

"Chicago, Jan. 11, 1929.

"I hereby will my policy #39154, Chicago Nat'l Life Insurance Co., $1,000, to Emil O. Kowalski, 50 W. 44th St. He will take care of my funeral for me and pay cost of same. He is a life long friend I can trust.

Respectfully,

(signed) Edward Reckels.

50 W. 44th st.''

Robert Peters testified in substance that in December, 1928, he was working for the Chicago Daily Journal and had been for about three months; that he solicited subscriptions for the newspaper and applications for insurance; that on December 13, 1928, he obtained, at Kowalski's home at 50 W. 44th street, Chicago, the application in question, as well as several other applications for similar insurance from Kowalski and members of his family; that at the time *"Edward Reckels was not there";* that he "never saw Reckels"; that at Kowalski's request he took the application in question for insurance as coming from Reckels; that he asked the questions as to Reckels of Kowalski and, upon Kowalski answering them, he (Peters) wrote in the answers as given; that after this was done, *"Kowalski* signed the application *by signing the name, Edward Reckels,* and then I (Peters) signed it as a witness"; that Kowalski at the time paid him (Peters) $2, which, with the application as finally filled out and signed and delivered, he turned into the office of the Chicago Daily Journal; and that the answer to question 23 in the application, as originally given by Kowalski and written in by the witness, was not the word "Estate" but that after the first answers as given by Kowalski were written, they were erased

by the witness at Kowalski's request and the word "Estate" substituted. The witness was not allowed by the court to state what the former answers, as given by Kowalski, were. Defendant's attorney offered to prove by the witness that the former answers were to the effect that *Kowalski* was to be the *beneficiary* of the policy when issued and that his relationship to Reckels was that of a "friend." At the conclusion of Peters' testimony, plaintiff's attorney moved that all of it be stricken but the motion was denied. The ground of the motion, as stated, was that, as the policy by its terms was incontestable after having been in force for more than one year, all defects, etc. in the application were "waived."

Emil O. Kowalski, as defendant's witness, testified in substance that he resided at 50 W. 44th street, Chicago; that "the body of Reckels' will is in my handwriting"; that he put his (the witness') signature on the paper "for identification"; that he had known Reckels for many years; that he was "no relation to me,"—we were "just friends"; that he (the witness) was "pretty sure" that Reckels was living with him in 1928 and January, 1929; that he "had a five-room flat above me and worked for me as a house man, cleaning about my apartment and helping along"; that he had worked for the witness about five or six years; that this was all the work he did, "except when he would get a job somewhere and work outside"; that during December, 1928, the witness paid him for his services "by keeping him, and for such things as he wished"; that he died at No. 4401 Wentworth avenue, Chicago, "where he had been living about a week prior to his death"; that his habits as to sobriety were "all right— I mean he behaved himself"; that he "did not use intoxicating liquors to excess," although he "took a drink the same as I, or probably you"; and that "I (the witness) *signed Reckels' name to the application*

for the policy." The court would not allow the witness to testify what was the cause of Reckels' death or with whom he was living on Wentworth avenue when he died.

Henry Charbonnier, as defendant's witness, testified that he had known Reckels, his brother-in-law, for many years; that he "lived with us about three years and left our house in 1926"; that the witness occasionally saw him at the house in 1928 when he came for a visit; that in 1928 he "did some decorating and what little jobs he could get"; that he "was not in the habit of drinking to excess intoxicating liquors"; and that the witness remembers James Manfredini coming to his home in March, 1931, and having a conversation with him and his wife, Clara Charbonnier (plaintiff). For the purpose of refreshing the witness' recollection he was asked if he did not remember that in the conversation Manfredini was told in substance that Reckels at one time lived there, that he was driven away because he wouldn't work and because he drank intoxicating liquors to excess and was a drunkard, and that he continued to drink to excess during the years he lived with Kowalski. The court, an plaintiff's objection, would not allow the witness to answer.

James Manfredini, defendant's employee, testified that about March 20, 1931, he called at the Charbonnier home and had a conversation with plaintiff and Henry Charbonnier together; that he called there in defendant's behalf; that during the conversation Mrs. Charbonnier said that Reckels, while formerly living with them, had for the two or three years prior to his death been living with Kowalski, by whom he was occasionally employed; that before he left her home Reckels "was a drunkard"; that afterwards and while living with Kowalski he drank every day and "was known to be a drunkard." On plaintiff's motion the court struck from the record all of the witness' testimony as to said conversation. During the trial it

was admitted, and the court held in a finding of fact, that *Kowalski* paid all due premiums to defendant prior to Reckels' death.

The main contention, urged by defendant's counsel for a reversal of the judgment, is in substance that the evidence discloses that Kowalski had no insurable interest in Reckels' life, and, hence, the policy is against public policy and void and the judgment appealed from, based upon the policy, cannot stand. After considering the pleadings and such evidence as was admitted and not stricken by the trial court, as well as numerous adjudicated cases in this and other States, we agree with the contention. It appears from the evidence that Reckels did not sign any application and did not himself take out the policy in question; did not know that any insurance in his name had been applied for until about the time he executed his will at Kowalski's request on January 11, 1929; never paid any of the premiums as they fell due; and was merely a friend and not a relative of Kowalski. In 37 Corpus Juris, sec. 51, p. 385, it is said: "A person cannot take out a valid and enforceable policy of insurance for his own benefit on the life of a person in which he has no insurable interest; such a policy or contract of insurance is void and unenforceable on grounds of public policy, it being merely a wagering contract, . . . " This is the law in Illinois. (*Hawley v. Aetna Life Ins. Co.,* 291 Ill. 28, 30; *Guardian Mut. Life Ins. Co. v. Hogan,* 80 Ill. 35, 44–5; *Colgrove v. Lowe,* 343 Ill. 360, 363; *Dresen v. Metropolitan Life Ins. Co.,* 195 Ill. App. 292, 294.) In *Bruce v. Illinois Bankers Life Ass'n,* 207 Ill. App. 555, 558, it is said: "In this State the law seems to be pretty well settled that it is a question of fact as to whether a person has an insurable interest in the life of another." And in 37 Corpus Juris, sec. 51, p. 386, it is stated that "Such a policy" (i. e., one taken out by a person for his own benefit on the life of another in which he has no insurable interest)

"is void at its inception, and is not rendered valid by a clause declaring it incontestable after the lapse of a specified period of time." And in the same text-book, vol. 37, sec. 69, p. 398, it is further said: "But a clause in the policy rendering it incontestable after a specified period does not estop the company from contesting it after the expiration of such period on the ground of want of insurable interest." (See, also, 6 A. L. R. 452, note III; *Bromley's Adm'r v. Washington Life Ins. Co.*, 122 Ky. 402, 406, 407; *Clement v. New York Life Ins. Co.*, 101 Tenn. 22, 37–8; *Home Life Ins. Co. v. Masterson*, 180 Ark. 170, 177, 178.)

Defendant's counsel also contend that the judgment should be reversed because (1) of the false and fraudulent representations made in the application and relied upon by defendant as being true, and (2) of the erroneous rulings of the trial court in refusing to admit certain evidence offered by defendant. In view of our above holdings it is unnecessary for us to pass upon these questions.

The judgment appealed from should be reversed and it is so ordered.

*Reversed with findings of fact.*

Kerner and Scanlan, JJ., concur.

Findings of fact: We find as facts in this case that Reckels did not sign any application for insurance and did not himself take out the policy in question; that Reckels was not present when Kowalski signed the application in Reckels' name and delivered it to defendant; that Reckels did not know that any insurance in his name had been applied for until he afterward executed his will at Kowalski's request; that Kowalski paid all premiums on the policy when due and that Reckels paid no premiums; that Reckels was not a relative of Kowalski but only a friend of his and at times an employee; and that Kowalski did not have any insurable interest in Reckels' life.